[Nos. A100075, A100279. First Dist., Div. Five. Dec. 22, 2003.]

MATEEL ENVIRONMENTAL JUSTICE FOUNDATION, Plaintiff and Appellant, v.
EDMUND A. GRAY CO. et al., Defendants and Respondents.

12

14

COUNSEL

Klamath Environmental Law Center, William Verick, David H. Williams; Public Interest Lawyers Group, David Williams and Fredric Evenson for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Richard M. Frank and Theodora Berger, Assistant Attorneys General, Craig C. Thompson and Edward G. Weil, Deputy Attorneys General, for People of the State of California ex rel. Bill Lockyer, Attorney General, as Amicus Curiae on behalf of Plaintiff and Appellant.

McKenna Long & Aldridge, Ann G. Grimaldi, Stanley W. Landfair and Eric S. C. Lindstrom for Defendant and Respondent Edmund A. Gray Company.

Stanzler Funderburk & Castellon, Ruben A. Castellon and Shane C. Stafford for Defendant and Respondent Grinnell Corporation.

McDonough, Holland & Allen, John R. Briggs for Defendant and Respondent Thrifty Supply Company.

McQuaid, Metzler, Bedford & Van Zandt, Neil R. Bardack and Michael J. Van Zandt for Mueller Industries, Inc., Legend Valve & Fitting, Inc., Kitz Corporation of America, Milwaukee Valve Company, Inc., John M. Frey Company, Inc., Smith-Cooper International and LDR Industries, Inc., as Amici Curiae on behalf of Defendants and Respondents.

OPINION

GEMELLO, J.—The Safe Drinking Water and Toxic Enforcement Act of 1986 (Health & Saf. Code, §§ 25249.5–25249.13), adopted by vote of the people at the November 1986 election as Proposition 65, regulates the discharge of specific toxins into California's drinking water. A Proposition 65 plaintiff alleging an unlawful discharge bears the burden of proving that a

discharge has in fact occurred. Regulations adopted pursuant to Proposition 65 establish a hierarchy of four "tiers" of tests that may be used to measure whether a listed toxin has been discharged. The regulations provide that a discharge occurs if the toxin is detectable using a test from the highest available tier.

In this case, plaintiff alleged that plumbing parts distributed by defendants discharge lead into drinking water. On a motion for summary judgment, defendants asserted that a Tier 1 test for lead in drinking water exists, the trial court agreed that a Tier 1 test exists, and the trial court granted summary judgment because plaintiff had not performed a Tier 1 test. We disagree with the trial court's conclusion that the test put forward by the defendants is a Tier 1 test. Consequently, we reverse the judgment for defendants and remand for the trial court to consider whether the tests plaintiffs actually performed qualify under any of the tiers provided by Proposition 65's regulations.

FACTUAL AND PROCEDURAL BACKGROUND[1]

Defendants Edmund A. Gray Co., Grinnell Corporation, and Thrifty Supply Company (collectively Plumbing Distributors) are distributors of galvanized plumbing parts in California. Galvanization is a process in which steel is dipped in a hot zinc bath. As the zinc cools, it forms a thin coating. The zinc coating protects against rust and corrosion. However, according to an expert for plaintiff Mateel Environmental Justice Foundation (Mateel), when lead is present in a galvanizing bath, it moves to the surface of the zinc coating as the zinc cools. Consequently, the galvanized steel may have small islands of lead on its surface.

Mateel sued five plumbing distributors. It contended in its first two causes of action that the distributors had violated the discharge and warning provisions of Proposition 65 by selling plumbing parts that discharge lead into drinking water and by failing to warn consumers of this exposure. In a third cause of action, Mateel alleged that these Proposition 65 violations were unlawful business practices under the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.).

The trial court trifurcated the case. The first stage was confined to determining whether Mateel could prove that a discharge of lead had occurred. Shortly before the first-stage trial, the Plumbing Distributors filed separate motions for summary adjudication of plaintiff's various claims. With

---

[1] This is an appeal from a grant of summary judgment. Accordingly, we must accept as true the facts shown by plaintiff's evidence, granting it the benefit of all reasonable inferences. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1001 [67 Cal.Rptr.2d 483].)

respect to the two pure Proposition 65 claims, the trial court granted summary adjudication after it determined that Mateel had failed to serve legally sufficient 60-day notices of the alleged violations before filing suit. (Health & Saf. Code, § 25249.7.) Those claims are no longer at issue. The trial court allowed the derivative UCL claim to proceed, concluding that Proposition 65's presuit notice requirements did not apply.

With respect to the UCL discharge claim, the Plumbing Distributors argued that Mateel had no evidence their products discharged lead. In particular, they argued that under California Code of Regulations, title 22, section 12901 (Regulation 12901), Mateel was required to show the existence of lead discharged from defendants' products by means of a state-approved methodology, if one existed. According to the Plumbing Distributors, such a test existed: the Lead and Copper Rule (Cal. Code Regs., tit. 22, § 64670 et seq.).[2] Mateel responded by submitting seven tests of its own, each purporting to show that defendants' products discharged lead into drinking water. Mateel argued that it was not required by Regulation 12901 to employ a state-approved methodology if one existed, that its tests were sufficient to show a discharge, and that, in any event, the Lead and Copper Rule was not a state-approved methodology for detecting lead discharged from individual plumbing parts.

The trial court agreed with the Plumbing Distributors on all issues. It concluded that as a matter of law a state-approved methodology had to be employed if one existed, that the Lead and Copper Rule was such a methodology, that Mateel failed to submit evidence that lead had been detected using the Lead and Copper Rule, and thus that the Plumbing Distributors were entitled to summary judgment.

Mateel has timely appealed, challenging only the ruling on its UCL discharge claim. On appeal, we granted the Attorney General leave to file an amicus curiae brief and appear at oral argument.

DISCUSSION

I. *Summary Judgment*

A "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary adjudication of a cause of action must show either that one or more elements of the cause of

---

[2] All further cites to Regulations are to title 22 of the California Code of Regulations.

action cannot be established or that there is a complete defense. "[A]ll that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action . . . . [T]he defendant need not himself conclusively negate any such element . . . ." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493], fn. omitted.) If that burden is met, the burden shifts to the plaintiff to show the existence of a triable issue of fact with respect to that cause of action or defense. (Code Civ. Proc., § 437c, subd. (p)(2); see *Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 467 [110 Cal.Rptr.2d 627].)

We review a summary judgment motion de novo to determine whether there is a triable issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. (*Galanty v. Paul Revere Life Ins. Co.* (2000) 23 Cal.4th 368, 374 [97 Cal.Rptr.2d 67, 1 P.3d 658]; Code Civ. Proc., § 437c, subd. (c).) We are not bound by the trial court's stated reasons or rationales. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878 [116 Cal.Rptr.2d 158].) "In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment." (*Lenane v. Continental Maritime of San Diego, Inc.* (1998) 61 Cal.App.4th 1073, 1079 [72 Cal.Rptr.2d 121].) Thus, we independently determine the construction and effect of the facts presented to the trial judge as a matter of law. (*Saldana v. Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1511–1515 [285 Cal.Rptr. 385].) Summary judgment is a drastic remedy to be used sparingly, and any doubts about the propriety of summary judgment must be resolved in favor of the opposing party. (*Kulesa v. Castleberry* (1996) 47 Cal.App.4th 103, 112 [54 Cal.Rptr.2d 669]; *WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1709 [50 Cal.Rptr.2d 323].)

With these principles in mind, we consider the propriety of the summary judgment entered by the trial court.

## II. *Proposition 65*

Proposition 65 was designed, in pertinent part, to regulate the discharge or release of cancer-causing chemicals (carcinogens) and reproductive toxins (teratogens) into drinking water. (Health & Saf. Code, §§ 25249.5–25249.13;[3] *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 298 [58 Cal.Rptr.2d 855, 926 P.2d 1042].) Under section 25249.5, the discharge prohibition, "No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or

---

[3] Unless otherwise indicated, all further statutory references are to the Health and Safety Code.

reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water, notwithstanding any other provision or authorization of law except as provided in Section 25249.9." Section 25249.8 requires the state to publish and update annually a list of these known carcinogens and teratogens. Lead is a listed carcinogen and teratogen. (Regs., § 12000, subd. (b), (c).) It is known to harm sperm formation, impair ovulation, and affect fetal development.[4]

Section 25249.9 sets out several affirmative defenses. Of relevance here, "Section 25249.5 shall not apply to any discharge or release that meets both of the following criteria: [¶](1) The discharge or release will not cause any significant amount of the discharged or released chemical to enter any source of drinking water; [¶](2) The discharge or release is in conformity with all other laws and with every applicable regulation, permit, requirement, and order." (§ 25249.9, subd. (b).) Proposition 65 defines "significant amount" as "any detectable amount except an amount which would meet the exemption test in subdivision (c) of Section 25249.10 if an individual were exposed to such an amount in drinking water." (§ 25249.11, subd. (c).) The burden for showing this affirmative defense is on the defendant: "In any action brought to enforce Section 25249.5, the burden of showing that a discharge or release meets the criteria of this subdivision shall be on the defendant." (§ 25249.9.)

■ Thus, Proposition 65 establishes a series of shifting burdens. In the first instance, a plaintiff must show that a discharge has occurred. Once this burden has been met, the defendant may show, inter alia, that the amount of the discharge is not significant. We deal here only with plaintiff's initial burden of proving a discharge under section 25249.5.

III. *The Lead and Copper Rule Is Not a Tier 1 Test for Lead from Sources Other Than Public Water Systems*

A. *Regulation 12901*

A "discharge" is not defined by Proposition 65, but is defined by the regulations adopted by the California Health and Welfare Agency (HWA)[5] to

---

[4] See Declaration of James Donald, Acting Chief of the Reproductive Toxicology Unit, Office of Environmental Health Hazard Assessment, California Environmental Protection Agency in Support of Order to Show Cause, *People v. Baccarat, Inc.*, San Francisco Superior Court No. 932292 (Sept. 6, 1991) pp. 3–4.

[5] In 1987 the Health and Welfare Agency was designated by the Governor the "lead agency" which "may adopt and modify regulations, standards, and permits as necessary to conform with and implement the provisions of [Proposition 65] and to further its purposes." (§ 25249.12; Exec. Order D-61-87 (Jan. 6, 1987); *People ex rel. Lungren v. Superior Court*, *supra*, 14 Cal.4th at p. 309.) The Health and Welfare Agency delegated that duty to the Health Hazard Assessment Division of the Department of Health Services, which at that time was

implement Proposition 65. Those regulations define a discharge thusly: "For purposes of Sections 25249.5 and 25249.6 of the Act, no discharge, release or exposure occurs unless a listed chemical is *detectable* as provided in this section." (Regs., § 12901, subd. (g), italics added.) In turn, subdivision (a) of Regulation 12901 provides, "For purposes of Section 25249.11, subdivision (c) of the Act, the term 'any detectable amount' means a level detected using a method of analysis referred to in this section. For purposes of this section, 'method of analysis' refers to the method of detection or detection and calculation for a listed chemical in a specific medium, including, but not limited to, water, air, food, or soil, and shall include methods and procedures concerning the number of samples and the frequency and site of sampling that are specific for the listed chemical in question." (Regs., § 12901, subd. (a).)

Subdivisions (b) through (e) of Regulation 12901 describe a hierarchy of methods of analysis that are to be used in detection. Under subdivision (b), Tier 1 tests are those that have been adopted or employed by one of a specified list of state and local agencies, including the California Department of Health Services. Under subdivision (c), Tier 2 tests are those that have been adopted or employed by a federal agency. Under subdivision (d), Tier 3 tests are those that are generally accepted in the scientific community, as evidenced by publication in professional journals and compilations. Finally, under subdivision (e), Tier 4 tests are those that are scientifically valid.

Mateel, the Attorney General, and the Plumbing Distributors offer three competing interpretations of this regulation. According to Mateel, it need only prove that any amount of a listed chemical has been discharged; it need not prove that the amount is "detectable" within the meaning of Regulation 12901, subdivision (g). It is then defendant's burden to prove that the amount involved is not detectable. According to the Attorney General, a plaintiff must prove that a detectable amount—that is, an amount capable of detection using the applicable tier test—has been discharged, but it may do so by any available evidence, and need not submit a test from the highest tier available. Finally, according to the Plumbing Distributors, a plaintiff must prove that an amount capable of detection using the highest available tier test has been discharged, and if it conducts scientific testing, it may only do so by performing and submitting the results of a test from the highest available tier.

within the Health and Welfare Agency. In 1991, when the California Environmental Protection Agency was created, the Governor transferred "lead agency" responsibilities directly to the Office of Environmental Health Hazard Assessment, which had been transferred to this newly created agency. (Exec. Order W-15-91 (July 17, 1991).) (*People ex rel. Lungren v. Superior Court, supra,* at p. 310 & fn. 6; Regs., § 12102, subd. (o).) For simplicity, we refer to the agency as the Health and Welfare Agency or HWA.

As we shall explain, at this stage, we need not resolve which of these competing interpretations of the burden of proof under Regulation 12901 is correct.[6]

Under Mateel's and the Attorney General's interpretations, a defendant seeking summary judgment must produce its own test that shows no detected amount of the toxin. This is the traditional *Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242 [91 L.Ed.2d 202, 106 S.Ct. 2505] approach to a summary judgment, in which the defendant presents evidence on a material issue and puts plaintiff to the test of coming forward with contradictory evidence. The Plumbing Distributors have not employed this approach; they have not submitted their own negative test results as part of their motion for summary judgment.

Under the Plumbing Distributors' interpretation, a second approach is available: a defendant may show simply that a test from a specific tier exists, and that plaintiff has not produced a positive test from that tier. This approach is a variation on the *Celotex Corp. v. Catrett* (1986) 477 U.S. 317 [91 L.Ed.2d 265, 106 S.Ct. 2548] approach, as recently approved in California by *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at pp. 845–855, under which a defendant points to an element of plaintiff's case and demonstrates that the plaintiff will be unable to come forward with evidence to substantiate that element. (See *id.* at p. 854.)

However, even if the Plumbing Distributors' interpretation of Regulation 12901 were correct—and we expressly do not decide whether this is so—summary judgment would only be available once the defendant established that a test from a specific tier within the hierarchy exists. The Plumbing Distributors have pointed to a specific test, the Lead and Copper Rule, which they contend is a Tier 1 test, and have tried to show that Mateel's tests are not Tier 1 tests. We conclude that the Lead and Copper Rule is not a Tier 1 test; therefore, the Plumbing Distributors have failed to meet their summary judgment burden even under their own interpretation of Regulation 12901.

### B. *The Lead and Copper Rule*

█ The Lead and Copper Rule (Regs., § 64670 et seq.) was adopted by the California Department of Health Services to monitor and address lead and copper levels in public drinking water distribution systems. It establishes a

---

[6] In an emerging area of the law, we do well to tread carefully and exercise judicial restraint, deciding novel issues only when the circumstances require. (See *Carlson v. Blatt* (2001) 87 Cal.App.4th 646, 648 [105 Cal.Rptr.2d 42].) We choose to exercise such restraint here, leaving the important question of the correct interpretation of the burden of proof under Regulation 12901 for another day.

protocol for monitoring lead and copper levels in public water systems. (Regs., § 64670, subd. (a); see Regs., §§ 64400.10, 64401.85.)

■ Under the Lead and Copper Rule, public water distribution systems must identify sampling sites within the distribution system. (Regs., § 64682, subd. (a).) These sampling sites must each contain lead solder or lead pipes or be served by a lead service line. (Regs., § 64682, subds. (c)–(f).) One-liter tap and service line water samples must be drawn after letting the water sit in the distribution system for at least six hours. (Regs., §§ 64671.25, 64683, subds. (a)–(c).) The Lead and Copper Rule specifies the number and frequency of samples to be drawn. (Regs., §§ 64684–64685.) Subsequent analysis of the samples is to be done in accordance with federal regulations governing the monitoring of contaminants in public water systems. (Regs., § 64672; 40 C.F.R. §§ 141.23, 141.89 (a).)

■ The Lead and Copper Rule establishes a threshold concentration, one microgram per liter, below which the lead level shall be considered zero. (Regs., § 64672, subd. (c)(3).) Public water systems must report their test results on a regular basis (Regs., § 64691) and, depending on those results, must take steps to install corrosion control, treat the system source water, remove lead service lines, and/or issue warning notices to residents served by the distribution system. (Regs., §§ 64673–64680.)

■ Under Regulation 12901, a method of analysis is any "method of detection or detection and calculation for a listed chemical in a specific medium." (Regs., § 12901, subd. (a).) A method of analysis is a Tier 1 method if "the California Department of Health Services [or one of several other agencies] has adopted or employs [the] method of analysis for a listed chemical in a specific medium . . . ." (Regs., § 12901, subd. (b).)

The Plumbing Distributors contend that the Lead and Copper Rule is a Tier 1 method of analysis that must be employed by plaintiff in order to meet its burden of proving a detectable amount of lead in drinking water. They argue that it is a test "for a listed chemical in a specific medium," specifically, lead in water. (See Regs., § 12901, subd. (b)). The Plumbing Distributors reason that the Lead and Copper Rule was adopted by the California Department of Health Services, and tests adopted or employed by that agency are Tier 1 tests (Regs., § 12901, subd. (b)); a scientific test qualifies as a method of analysis under Regulation 12901 so long as it specifies the "methods and procedures concerning the number of samples and the frequency and site of sampling," and the Lead and Copper Rule does so; and the Lead and Copper Rule complies with "generally accepted standards and practice for sampling, collection, storage, preparation, chemical analysis, statistical analysis of data, interpretation of results and modeling." (See Regs., § 12901, subds. (a), (f).)

Thus, according to the Plumbing Distributors, this makes the Lead and Copper Rule a Tier 1 test, and defendants argue that because Mateel failed to comply with the exact protocol, summary judgment was proper.

■ We disagree with this interpretation and application of Regulation 12901. The Lead and Copper Rule is a method of analysis, but it is not a Tier 1 test for lead from sources other than public water systems. When an agency designs, adopts, or employs a test in a manner that renders it specific to a particular context or environment, that test qualifies as a method of analysis only when applied in the same context or environment.

■ The Lead and Copper Rule includes detailed context-specific sampling procedures. (Regs., §§ 64671.25, 64682–64685.) These procedures include the requirement that a "water system" identify and take samples at between 5 and 100 sites over at least two six-month periods. (Regs., § 64684, subds. (a), (b).) The pool of sites is limited to residences containing copper pipes with lead solder, lead pipes, or pipes serviced by lead service lines. (Regs., § 64682, subds. (c)–(g).) These sampling requirements limit the applicability of the Lead and Copper Rule. The rule cannot be applied outside a public water system. Given the requirements that multiple sampling sites be used and that those sites involve already-in-place lead solder, lead pipe, or lead service lines, it is of no use for detecting lead discharges from a single specific plumbing part such as the galvanized steel parts at issue in this case.

The Plumbing Distributors argue that the Lead and Copper Rule can be used to test for lead discharges from individual parts. We are not persuaded. Nothing in the Lead and Copper Rule authorizes a private plaintiff to identify places where a defendant's parts are already in use (or plumb in new parts), go to a public water distribution system, demand that specific new sampling sites be used adjacent to those parts (which may or may not comply with the Lead and Copper Rule's limits on where samples must be taken), and then separate out the sampling results from those sites, while discarding the results from the dozens or hundreds of other samples taken in accordance with the Lead and Copper Rule's requirements.

■ Moreover, the Lead and Copper Rule has been adopted and employed by the California Department of Health Services only for testing for lead in water in public water systems. It is not a universal test for lead in water; it has never been adopted or employed as a methodology of general application. Because it has only been employed in the context of analyzing an entire public water system, it is not a valid Tier 1 test outside that context, nor is it a valid test for detecting discharges from other sources. Thus, the fact that this case involves testing for lead in water, and the Lead and Copper Rule *also* involves testing for lead in water, does not qualify the Lead and Copper Rule as a Tier 1 test for purposes of this case.

Consider the hypothetical of a lead discharge directly into a water reservoir. (See *People ex rel. Lungren v. Superior Court, supra,* 14 Cal.4th at p. 304.) Should a plaintiff be required to take the allegedly polluted water, inject it into various parts of a public water system, and then test it there? Clearly not. A scientifically valid, state-adopted test suitable for measuring a particular toxin in a particular medium in one unique environment may not be a suitable way to test for that toxin in that medium in any other environment.

In reaching this conclusion, we do not second-guess the judgment of either the HWA in establishing standards for each tier of tests or the California Department of Health Services in adopting the Lead and Copper Rule. Instead, our conclusion is consonant with the reasoning underlying Regulation 12901's hierarchy. The reason the HWA chose to look first to tests employed by local and state regulatory agencies was because "it is likely [regulated] entities are using such methods" already to self-monitor their own emissions. (HWA, Final Statement of Reasons (1988) p. 6.) In addition, "the selection of methods by State and local regulatory agencies is based on considerations of the availability of the method to the regulated community and of the suitability of the method to characteristics unique to a particular locality." (*Ibid.*) When a methodology's protocol confines its application to one unique context—here, an entire public water distribution system—there is no likelihood that regulated entities in wholly different contexts will already be using the method to self-monitor. Nor does the methodology carry with it any agency imprimatur that it is suitable for testing in any other context. Moreover, the acknowledgement that the suitability of a method may vary from locality to locality supports the notion that tests may be context or environment specific, and that a test suitable in one context may not be appropriate in another.

We note as well that the elements identified by the Plumbing Distributors as necessary to qualify a test as a Tier 1 are not in fact all necessary. Regulation 12901 defines a "method of analysis" for detecting toxic chemicals simply as any "method of detection or detection and calculation for a listed chemical in a specific medium." (Regs., § 12901, subd. (a).) By its terms, Regulation 12901 does not require a specific sampling protocol as a necessary element of a method of analysis. Rather, the regulation more narrowly requires that if a method of detection does specify "methods and procedures concerning the number of samples and frequency and site of sampling that are specific for the listed chemical in question, " those methods and procedures shall be considered an integral part of the method of analysis and must be followed and applied. (*Ibid.*) If the methodology's design does not include chemical-specific sampling procedures, then a party employing the method must still abide by "generally accepted standards and practice for sampling" when performing the test. (Regs., § 12901, subd. (f).)

Regulation 12901's testing hierarchy was intended to eliminate threshold disputes over conflicting test results using different methodologies and over which tests should be used. It was not intended to create an insuperable barrier to identifying actual discharges when they occur. We decline to interpret or apply the Regulation in a fashion that would frustrate the purpose of the statute which it implements, Proposition 65—a statute intended to eliminate, insofar as possible, toxic discharges into California's drinking water. (See *State ex rel. Lungren v. Superior Court, supra,* 14 Cal.4th at p. 314 [as a "remedial statute," Proposition 65 must be "construed broadly to accomplish [its] protective purpose"].)

Consequently, the trial court erred in granting summary judgment on the ground that the Plumbing Distributors had shown a Tier 1 test to exist and Mateel had failed to conduct a Tier 1 test. It remains possible that a Tier 1 test for lead in water does exist. For example, the Lead and Copper Rule requires that "[a]nalyses for lead . . . be conducted using the methods as prescribed at 40 Code of Federal Regulations, Section 141.89." (Regs., § 64672, subd. (a).) In turn, the Code of Federal Regulations identifies specific methods for lead detection that may well apply generally to the detection of lead in water and may well qualify as either Tier 1 or Tier 2 tests. (40 C.F.R. §§ 141.89, 141.23 (k)(1).)[7] However, the Plumbing Distributors did not attempt to prove that these methods were Tier 1 or 2 tests, nor did they attempt to prove that Mateel had failed to comply with one or more of these methodologies. Instead, they rested their argument on the Lead and Copper Rule as a whole. Because the Lead and Copper Rule does not qualify as a Tier 1 test for purposes of these allegations, summary judgment on this basis cannot stand.

IV. *The Trial Court Must Rule in the First Instance on the Plumbing Distributors' Evidentiary Objections and Whether Any of Mateel's Tests Qualify as a Method of Analysis*

In the alternative, the Plumbing Distributors propose that summary judgment was proper because several of Mateel's tests were inadmissible. We will remand this case to the trial court to consider these evidentiary matters in the first instance.

---

[7] In its briefs and at oral argument, Mateel contended that one of its tests satisfied the requirements of one of those specific methods, EPA Method 200.8, and thus qualified as at least a Tier 2 or even a Tier 1 test. At this stage, we need not resolve whether EPA Method 200.8 is a Tier 2 test, because adopted by a federal agency, or a Tier 1 test, because also adopted by a qualifying state agency, nor are we prepared to determine whether Mateel in fact complied with both the requirements of the methodology and the additional standards imposed by Regulation 12901, subdivision (f).

In response to the Plumbing Distributors' motions, Mateel came forward with a series of scientific tests detecting lead discharged from the Plumbing Distributors' plumbing parts. Under Regulation 12901, these tests constitute evidence of a discharge so long as they are admissible and fall within at least the lowest tier of available tests, Tier 4, the tier that covers all "scientifically valid" tests that do not fall within a higher tier. (Regs., § 12901, subd. (e).)

In the trial court, the Plumbing Distributors moved to exclude four of the seven tests performed by Mateel: the Hovanec test, the NSF test, the Exhibit 9 test, and the Exhibit 10 test. They argued that these tests failed to satisfy the standards for scientific reliability imposed by the *Kelly* rule. (*People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; see *Frye v. U.S.* (D.C. Cir. 1923) 54 U.S. App. D.C. 46 [293 F. 1013].)[8] The trial court granted this motion, but the record demonstrates that it did not do so on *Kelly* grounds. At an April 23, 2002, hearing, Mateel sought clarification of the basis for the exclusion. The trial court confirmed that it excluded the tests based on Mateel's purported failure to comply with Regulation 12901. In other words, it excluded the tests because it concluded that the Plumbing Distributors had shown a Tier 1 test existed (the Lead and Copper Rule), and thus the results of any test which was not a Tier 1 test were irrelevant.[9]

Generally, we review the trial court's ruling on the admissibility of expert testimony for an abuse of discretion. (*People v. Rowland* (1992) 4 Cal.4th 238, 266 [14 Cal.Rptr.2d 377, 841 P.2d 897].) However, when the exclusion of expert testimony rests on a matter of statutory interpretation, we apply de novo review. (*Plunkett v. Spaulding* (1997) 52 Cal.App.4th 114, 126 [60 Cal.Rptr.2d 377], disapproved on other grounds by *Schreiber v. Estate of Kiser* (1999) 22 Cal.4th 31, 39–40 [91 Cal.Rptr.2d 293, 989 P.2d 720].) As discussed *ante*, we disagree with the trial court's interpretation of Regulation

---

[8] Under the *Kelly* rule, formerly known as the *Kelly-Frye* rule, the "admissibility of expert testimony based on 'a new scientific technique' requires proof of its reliability—i.e., that the technique is ' "sufficiently established to have gained general acceptance in the particular field to which it belongs." ' " (*People v. Venegas* (1998) 18 Cal.4th 47, 76 [74 Cal.Rptr.2d 262, 954 P.2d 525], quoting *People v. Kelly, supra,* 17 Cal.3d at p. 30.) Federal courts no longer follow *Frye*, which has been overruled by the United States Supreme Court. (See *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 585–589 [125 L.Ed.2d 469, 113 S.Ct. 2786].) Since *Daubert*, the California Supreme Court has reaffirmed *Kelly*'s adoption of the former standard in *Frye*, which is now known simply as the *Kelly* rule. (See *People v. Leahy* (1994) 8 Cal.4th 587, 591–592 [34 Cal.Rptr.2d 663, 882 P.2d 321].)

[9] The Plumbing Distributors argue that we must ignore the basis for the trial court's ruling because it became apparent subsequent to the entry of the order. The case the Plumbing Distributors rely upon, *Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813 [180 Cal.Rptr. 628, 640 P.2d 764], only excludes from consideration matters occurring postjudgment, and then only in some circumstances. The reason for the exclusion of Mateel's tests became apparent prejudgment and is properly part of the appellate record.

12901's requirements for Tier 1 tests. Because the Lead and Copper Rule is not a Tier 1 test, the premise underlying the trial court's exclusion was incorrect, and the tests should not have been excluded on this basis.

■ The Plumbing Distributors invite us to decide whether the challenged tests are admissible under *Kelly*. We decline. When a trial court finds it unnecessary to rule on evidentiary objections, "it is not the function of an appellate court to make such evidentiary rulings in the first instance." (*Sambrano v. City of San Diego* (2001) 94 Cal.App.4th 225, 235 [114 Cal.Rptr.2d 151].) Thus, while we review a trial court's ruling, not its rationale, and will not reverse a correct ruling issued for the wrong stated reason (*Mayer v. C.W. Driver* (2002) 98 Cal.App.4th 48, 64 [120 Cal.Rptr.2d 535]), it is not for us to determine whether the trial court's ruling might still be correct on a factual and evidentiary basis not yet considered by it. That task is reserved for the trial court.

Our analysis of the Lead and Copper Rule requires that this matter be remanded for further proceedings. On remand, the trial court must reconsider the Plumbing Distributors' motions in limine and determine whether the four challenged tests are admissible under *Kelly*. Provided that one or more of Mateel's tests is admissible under *Kelly*, the motion for summary judgment must be denied.

■ To assist the trial court on remand, we address one final issue. The Plumbing Distributors contend that Mateel's tests are categorically invalid because they were not performed on drinking water, as opposed to any other water, and Regulation 12901 requires that tests be performed for the listed chemical in a "specific medium." Nothing in Regulation 12901 or the supporting Final Statement of Reasons supports such a narrow construction of the phrase "specific medium." In particular, Regulation 12901 defines a method of analysis as a "method of detection or detection and calculation for a listed chemical in a specific medium, *including, but not limited to, water, air, food, or soil . . . ."* (Regs., § 12901, subd. (a), italics added.) The examples given show that "water" is a specific medium under Regulation 12901, and that a test for lead in "water" will qualify as a method of analysis so long as it meets the other requirements of Regulation 12901.[10] Mateel's tests are not categorically invalid for any alleged failure to use "drinking water."

---

[10] Those requirements include the requirements that a party observe "generally accepted standards and practices for sampling, collection, storage, preparation, chemical analysis, statistical analysis of data, [and] interpretation of results and modeling." (Regs., § 12901, subd. (f).) On remand, the trial court is free to consider whether these requirements have been satisfied.

## Disposition

The judgment for defendants is reversed. This case is remanded for further proceedings consistent with this opinion. Mateel shall recover its costs on appeal.

Stevens, Acting P. J., and Simons, J., concurred.

On January 21, 2004, the opinion was modified to read as printed above.