Filed 7/7/21  Mateel Environmental Justice Foundation v. Ukiah Rifle and Pistol Club CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MATEEL ENVIRONMENTAL JUSTICE FOUNDATION,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>UKIAH RIFLE AND PISTOL CLUB,<br><br>    Defendant and Respondent. | A159015<br><br>(Mendocino County<br>Super. Ct. No. SCUKCVG18-70419) |

Plaintiff Mateel Environmental Justice Organization (Mateel) filed an action under the Safe Drinking Water and Toxic Enforcement Act of 1986 (Health & Saf. Code[1] § 25249.5 et seq. (Proposition 65 or Act)) seeking civil penalties and an injunction to stop Defendant Ukiah Rifle and Pistol Club (Club) from depositing bullets containing lead onto land where it could wash into a nearby creek and to remove existing leaded bullets from the land.  The Club moved for summary judgment, arguing it was not subject to Proposition 65 because it had fewer than 10 employees on the alleged discharge dates. The trial court granted the Club's motion, entered judgment for the Club, and dismissed the case.

Because there is a triable issue of fact as to whether the Club had 10 or more employees during the relevant time period, and thus whether the Club

---

[1] Undesignated statutory citations are to the Health and Safety Code.

1

was subject to Proposition 65's discharge prohibitions, we will reverse the judgment.

## BACKGROUND

Founded in 1955, the Club is a non-profit, tax-exempt membership corporation that operates a gun club and shooting range on approximately 98 acres of land in Ukiah. The Club hosts marksmanship competitions, firearm safety training, and junior rifleman programs each year. The Club offers a Junior Trap program to teach children under the age of approximately 14 to shoot trap and develop responsible shooting skills. The Club advertises to and enrolls non-members in that program, and several members run it. The revenue the program generates is used to cover the Club's general expenses.

The Club's members elect a board of directors (Board) to supervise and control the Club's activities. Between February 20 and October 30, 2017, the Board was composed of the Club's nine officers.[2] After amendments to the Club's bylaws took effect on October 30, 2017, the Club still had nine Board members, but only five of them were officers.

Board members had discretion to waive the $150 annual dues of members who provided exemplary service to the Club, such as those who spent significant time operating the Junior Trap shooting program or a hunter's education program, fundraising, and doing maintenance work on Club property. Between July 1, 2016 and June 30, 2017, the Club waived the dues of at least seven members who performed exemplary service to the Club.

_____

[2] In its opening brief, Mateel asserts that the Club had 10 officers between February 20, 2017, and October 30, 2017. Mateel relies on the fact that the Club's bylaws at the time stated that the Club would have 10 officers. But as the Club points out and Mateel does not dispute, there is no evidence in the record that a past president ever served as an officer, leaving only nine officers.

Between July 1, 2017 and June 30, 2018, the Club again waived the dues of at least seven such members, six of whom received a dues waiver the prior year. Two of the members who received dues waivers in both years helped run the Junior Trap program. The Club later stopped awarding waivers of dues.

The Club has known that users of its shooting ranges shoot leaded ammunition and that spent ammunition becomes embedded in the land at the Club's property. Mateel, an environmental organization, filed a Proposition 65 challenge on February 20, 2018, alleging that the Club discharged leaded ammunition onto its property and that, during rainstorms, lead from that ammunition washes into Sulphur Creek and subsequently into the Russian River. Mateel further alleged that lead is a listed pollutant under Proposition 65. Mateel therefore sought to enjoin the Club from shooting leaded ammunition onto its property where rain could fall on the projectiles. Mateel also sought civil penalties under section 25249.7, subdivision (b)(1) and an order requiring the Club to remove leaded projectiles from its property to the extent that rain could come in contact with it.

The Club moved for summary judgment, relying on section 25249.11, subdivision (b) to argue that it was not subject to Proposition 65 because it had fewer than 10 employees on the four days on which Mateel alleged lead from the Club's property had entered into a source of drinking water. The Club argued it had no employees because its officers and members who ran its programs were volunteers, not employees. Mateel countered that the relevant days were those on which the Club discharged leaded ammunition onto the land, not just four particular days when lead from the ammunition reached drinking water. Mateel also argued that the Club had more than 10

3

employees because the Club's officers and members who provided services for the Club received compensation in the form of waivers of their membership fees.

The trial court agreed with the Club, ruling that the Club did not have employees during the relevant time period. The court therefore granted the Club's motion, entered judgment for the Club, and dismissed the case.

## DISCUSSION

**I. Standard of Review**

Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant has met "his or her burden of showing that a cause of action has no merit if the party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to the cause of action." (*Id.*, subd. (p)(2).) Where, as here, the defendant moves for summary judgment on the grounds that one or more elements of the plaintiff's claim cannot be established, the defendant must present evidence that either "conclusively negate[s] an element of the plaintiff's cause of action" or "show[s] that the plaintiff does not possess, and cannot reasonably obtain," evidence needed to establish an element of the claim. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853–854 (*Aguilar*).) If the defendant meets this burden, "the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2).)

We review an order granting summary judgment de novo. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 60.) We consider all evidence presented in the moving and opposition papers, excluding evidence to which objections

4

were made and sustained. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Ibid.*)

"The question of whether a person is an employee [under Labor Code section 3200 et seq.] may be one of fact, of mixed law and fact, or of law only. Where the facts are undisputed, the question is one of law, and the Court of Appeal may independently review those facts to determine the correct answer." (*Barragan v. Workers' Comp. Appeals Bd.* (1987) 195 Cal.App.3d 637, 642 (*Barragan*); see *Land v. Workers' Comp. Appeals Bd.* (2002) 102 Cal.App.4th 491, 494.) "A trial court's interpretation of an administrative regulation is a legal determination and is reviewed de novo." (*As You Sow v. Conbraco Industries* (2005) 135 Cal.App.4th 431, 447.)

## II. Proposition 65

Proposition 65 "was designed, in pertinent part, to regulate the discharge or release of cancer-causing chemicals (carcinogens) and reproductive toxins (teratogens) into drinking water. (Health & Saf. Code, §§ 25249.5–25249.13; *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 298.) Under section 25249.5, the discharge prohibition, 'No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water, notwithstanding any other provision or authorization of law except as provided in Section 25249.9.' Section 25249.8 requires the state to publish and update annually a list of these known carcinogens and teratogens." (*Mateel Environmental Justice Foundation v. Edmund A. Gray Co.* (2003) 115 Cal.App.4th 8, 17–18, fn. omitted (*Mateel*).)

5

Section 25249.11, subdivision (b) excludes from the definition of "person in the course of doing business" anyone employing fewer than 10 employees, so businesses with fewer than 10 employees are not subject to the Act. The statute of limitations for a Proposition 65 claim is one year. (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 976 (*Shamsian*).)

The California Health and Welfare Agency (HWA)[3] promulgated regulations to clarify the meaning of Proposition 65. (*Mateel, supra,* 115 Cal.App.4th at p. 18, fn. 5.) In light of Proposition 65's nature as a remedial statute whose goal is to protect Californians from toxic chemicals in drinking water, we broadly construe the statute and its regulations. (*People ex rel. Lungren v. Superior Court, supra,* 14 Cal. 4th at p. 314 (*People ex rel. Lungren*).)

The premise of the Club's summary judgment motion was that one of Mateel's discovery responses identified only four dates in early 2018 on which Mateel contended the Club discharged lead into drinking water. The Club therefore aimed its arguments at those dates and contended that it had fewer than 10 employees on those dates. As it did in the trial court, Mateel argues both that the Club is mistaken about what dates are relevant and that the trial court erred in concluding the Club had fewer than 10 employees on the relevant dates. We address each of these arguments in turn.

---

[3] In 1987, the Governor designated the HWA as the "lead agency" tasked with implementing regulations for Proposition 65. (*Mateel, supra,* 115 Cal.App.4th at pp. 18–19, fn. 5.) In 1991, the Governor transferred "lead agency" responsibilities to the Office of Environmental Health Hazard Assessment (OEHHA). (*Ibid.*) OEHHA is currently the lead agency that implements Proposition 65. (Cal. Code Regs., tit. 27, § 25102, subd. (o); § 25249.12, subd. (a).) Although the HWA is no longer the implementing agency, it was when it issued the regulations relevant here. For the sake of clarity, we refer to the HWA as the implementing agency.

## A. Relevant Time Period (When Discharges Occur)

Proposition 65 applies to persons employing 10 or more employees, but it does not explain how to calculate the number of employees a person employs. (§ 25249.11, subd. (b).) The HWA's regulations fill in this gap, directing, "In computing whether a person employs 10 or fewer employees in his business, all full-time and part-time employees on the date on which the discharge . . . occurs must be counted. Thus, the prohibition[] on discharge . . . will apply to any person who has 10 or more full-time or part-time employees on the date in question." (Cal. Code Regs., tit. 27, § 25102, subd. (h).) The discharges the Act prohibits are those of a listed chemical "into water or onto or into land where such chemical passes or probably will pass into any source of drinking water." (§ 25249.5.) The HWA's regulations further clarify that " 'probably will pass into any source of drinking water' " means "more likely than not will pass into any source of drinking water." (Cal. Code Regs., tit. 27, § 25102, subd. (r).) Reading all these definitions together, an entity's liability under Proposition 65 turns on whether it employed 10 or more employees on each day when it discharged a listed chemical into water or onto or into land where it, more likely than not, would pass into drinking water.

Mateel's complaint alleges the Club committed such discharges every day that it allowed users to fire projectiles containing lead at the Club's gun ranges. Mateel filed its complaint on February 20, 2018, and the statute of limitations for Proposition 65 claims is one year. (*Shamsian, supra,* 107 Cal.App.4th at p. 976.) Accordingly, to defeat Mateel's complaint at summary judgment by establishing it was not subject to Proposition 65, the Club needed to prove it had fewer than 10 employees on every day on which it allowed users to discharge leaded ammunition at its ranges between

7

February 20, 2017, and February 20, 2018, or that Mateel did not have and could not obtain evidence that the Club had 10 or more employees on those days. (*Aguilar*, *supra*, 25 Cal.4th at pp. 853–854 [to prevail at summary judgment on the grounds that the plaintiff cannot establish an element of a cause of action, a moving defendant must either "conclusively negate an element of the plaintiff's cause of action" or show "that the plaintiff does not possess, and cannot reasonably obtain," evidence needed to establish an element of the claim].)  The Club's narrow focus on four dates within the period when rain allegedly washed lead from its property into Sulphur Creek was legally insufficient to entitle it to summary judgment because it failed to address Mateel's allegations that the firing of leaded ammunition was the relevant discharge for the purposes of Proposition 65.

The Club also errs in relying on Mateel's discovery responses to argue that only the four rainfall dates are relevant, or that Mateel offered conflicting theories for which dates are relevant.  The Club's interrogatory in question asked Mateel to state the dates on which rain fell on the lead on the Club's property, dissolved it, and carried the lead into Sulphur Creek.  This question did not ask Mateel to identify every date on which it alleged the Club violated the Act or discharged lead into water or onto land where it would more likely than not pass into drinking water.  Nor can Mateel's response be construed as identifying every date of the Club's alleged violations.  Mateel's response said that rain fell and washed lead into Sulphur Creek "[e]very day on which there was enough rainfall that stormwater ran off the property on which the . . . Club's shooting ranges are located" and that such dates "include[d]" the four listed dates.  Mateel further disclaimed any intent to provide an exhaustive list, stating, "The precise list of other dates on which storm water discharged from the . . . Club are not

8

known at this time." These responses in no way limit the time period of Mateel's allegations regarding the Club's liability[4].

## B. Definition of Employee

Although the Club's motion for summary judgment was deficient in that it addressed whether the Club was subject to Proposition 65 on only four dates within the limitations period, that alone does not entitle Mateel to a reversal of the judgment. The trial court granted the Club summary judgment based on the more expansive theory that the Club had no employees at any time during the relevant time period. The trial court had inherent power to grant summary judgment on this broader theory if the record supported it. (*Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 70.)[5] We therefore consider the definition of "employee" for the purposes of Proposition 65.

The regulation clarifying how to calculate of the number of employees a person employs also includes a substantive definition of who qualifies as an "employee." California Code of Regulations, title 27, section 25102,

---

[4] Relatedly, the Club asserted at oral argument that Mateel is bound by its statements in the trial court that the Club had only five officers. Mateel made these statements in response to the Club's summary judgment briefing, which, as discussed, addressed the number of Club employees only on four specific dates in early 2018. These statements therefore cannot be construed as establishing Mateel's position regarding the number of Club officers during the period from February 20 to October 30, 2017

[5] Because the trial court went beyond the arguments raised in the Club's motion, Mateel was entitled to the opportunity to respond to the rationale that the trial court adopted. (*Juge v. County of Sacramento, supra,* 12 Cal.App.4th at p. 70.) Mateel did not argue below that it was denied this opportunity, nor has it raised such an argument on appeal. (Cf. *Luebke v. Automobile Club of Southern California* (2020) 59 Cal.App.5th 694, 706 [reversing summary judgment on issue not raised in motion because trial court did not give plaintiff an opportunity to oppose].) Mateel's briefing below appears to have addressed the trial court's ultimate rationale.

9

subdivision (h) defines "employee" by incorporating definitions from other statutes: " 'Employee' shall have the same meaning as it does in Unemployment Insurance Code Section 621 and in Labor Code Section 3351. Generally, and without limiting the applicability of the definitions in these two statutes, this means that an employee is a person who performs services for remuneration under any appointment or contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully employed."

The parties' dispute centers on Labor Code section 3351. This statute is part of the Worker's Compensation Act (Lab. Code §§ 3200 et seq.; *Arriaga v. County of Alameda* (1995) 9 Cal.4th 1055, 1059, 1061 (*Arriaga*)) and broadly defines "employee" as "every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully employed . . . ." (Lab. Code, § 3351.) It also declares that the term includes "[a]ll officers and members of boards of directors of quasi-public or private corporations while rendering actual service for the corporations for pay." (Lab. Code, § 3351, subd. (c).) In *Arriaga*, our Supreme Court noted that the Worker's Compensation Act " 'intends comprehensive coverage of injuries in employment. It accomplishes this goal by defining "employment" broadly in terms of "service to an employer" and by including a general presumption that any person "in service to another" is a covered "employee." ' " (*Arriaga*, *supra*, 9 Cal.4th at p. 1061.)

The trial court ruled that officers and members of the Club would be employees if they provided service for pay. The court cited an opinion letter from the Division of Labor Standards Enforcement (DLSE), which stated that one of the controlling factors in determining whether an individual is an

10

employee or a volunteer is how the parties view their relationship. (Dept. of Industrial Relations, DLSE, Opinion Letter (October 27, 1988) p. 1, at <https://www.dir.ca.gov/dlse/opinions/1988-10-27.pdf> [as of July 8, 2021] (DLSE Opinion Letter).) But the court also cited *Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 214, which instructed that courts should consider "the reality of the situation, not the parties' characterization of the relationship." The trial court then concluded that none of the Club's officers or members were employees because they volunteered their services gratuitously and were not paid compensation. The trial court rejected Mateel's theory that the waivers of membership dues provided to officers or Club members who provided extraordinary service to the Club qualified as remuneration because the individuals did not expect dues waivers, the Club did not promise them, and the waivers were granted based on work performed in the previous year.

The Club defends the trial court's decision as well-reasoned, but we agree with Mateel that the trial court erred. As the trial court recognized, there is an established body of case law that distinguishes in various factual contexts between volunteers and employees under Labor Code section 3351. The HWA stated when it adopted California Code of Regulations, title 27, section 25102, subdivision (h)[6] that "it is appropriate to interpret the

---

[6] The definition of "employee" was originally promulgated at California Code of Regulations, title 22, section 12201, subdivision (c). (Former Cal. Code Regs., tit. 22, § 12201, subd. (c), Register 88, No. 11 (Mar. 12, 1988) p. 328.) It was transferred without substantive change to California Code of Regulations, title 22, section 12102, subdivision (h) in 2003, and then renumbered without change as California Code of Regulations, title 27, section 25102, subdivision (h) in 2008. (Former Cal. Code Regs., §§ 12102, subd. (h), 12201, Register 2003, No. 2 (Jan. 10, 2003), pp. 189–190; Cal. Code Regs., tit. 27, § 25102, Register 2008, No. 25, Digest of New Regulations, Title 22.)

definitions of 'employee' in Unemployment Insurance Code section 621 and Labor Code section 3351 in light of court decisions which further refine those terms." (Health and Welfare Agency, Final Statement of Reasons (Jan. 1, 1988) p. 18, at <https://oehha.ca.gov/media/downloads/crnr/art13fsorjan1988.pdf> [as of July 8, 2021]; see former Gov. Code, § 11346.7, subds. (a)(2) & (b)(1) (Stats. 1987, ch. 1375, § 14) [statute in effect in 1988 requiring agencies proposing regulations to prepare a final statement of the specific purpose of each regulation adopted]; see also Gov. Code, §§ 11346.2, subd. (b)(1), 11346.9, subd. (a)(1) [current version of this requirement].) We give great weight to its explanation of the intent behind California Code of Regulations, title 27, section 25102, subdivision (h). (*People ex rel. Lungren*, *supra*, 14 Cal.4th at p. 309 [" 'the contemporaneous administrative construction of [an] enactment by those charged with its enforcement . . . is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized' "].)

The cases consider various factors relevant to the distinction between volunteers and employees, depending on the circumstances. Some decisions examine whether the putative employer directed and controlled the putative employee. (E.g., *Arriaga*, *supra*, 9 Cal.4th at p. 1063 [plaintiff injured while working off a speeding ticket was under government agencies' control]; *Laeng v. Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 771, 782 (*Laeng*) [plaintiff injured while performing agility test for a position as a sanitation worker was under defendant city's control].) Other decisions consider whether the putative employee's service benefited the putative employer. (E.g., *id.* at pp. 781–782 [plaintiff job applicant's agility test benefitted the employer by helping the employer choose the best candidate for the job]; *Waggener v.*

12

*County of Los Angeles* (1995) 39 Cal.App.4th 1078, 1082–1083 [juror injured when exiting a jury box performed service that benefitted the county].)  Some decisions consider whether a putative employee performed the same service and was exposed to the same risks as recognized employees.  (E.g., *Arriaga, supra,* 9 Cal.4th at p. 1063 [injured plaintiff performed same tasks as defendants' transportation workers]; *Land v. Workers' Comp. Appeals Bd., supra,* 102 Cal.App.4th at p. 496 [student injured while performing tasks for a class in animal science was not working with paid workers and student's work was performed for an educational purpose and not usually done by paid employees]; *Hoppmann v. Workers Comp. Appeals Bd.* (1991) 226 Cal.App.3d 1119, 1125 [maintenance worker for church "worked shoulder to shoulder" with employees covered by worker's compensation, "did the same work . . . and ran the same risks"].)  Finally, several decisions turn on whether individuals received compensation or offered their services gratuitously.  (E.g., *Edwards v. Hollywood Canteen* (1946) 27 Cal.2d 802, 805–806 (*Hollywood Canteen*) [plaintiff who volunteered to dance with soldiers did so gratuitously, without pay]; (*Barragan, supra,* 195 Cal.App.3d at p. 649  [plaintiff injured while externing at a hospital to earn school credits she needed to graduate was an employee because she worked at the hospital as a required component of her education, not out of the goodness of her heart]; see Lab. Code, § 3352, subd. (a)(9) ["employee" excludes a "person performing voluntary service for . . . a private, nonprofit organization who

does not receive remuneration for the services, other than meals, transportation, lodging, or reimbursement for incidental expenses"].)[7]

The parties' evidence and briefing below was aimed almost exclusively at the last factor, focusing on whether the Club's members who served as officers or provided other services were volunteers because they received no compensation. The trial court's ruling understandably focused on that question as well. However, because no single factor appears to be controlling when distinguishing between volunteers and employees, there may be a dispute of material fact on the other factors that would preclude summary judgment. But we need not examine the other factors in detail, because we also find a triable issue of material fact on the one factor the parties and the trial court addressed in detail concerning whether the Club compensated its officers and members who provided services to the Club.

Preliminarily, the DLSE Opinion Letter, on which the trial court relied and which the Club cites in its brief for the notion that the parties' intent is controlling, is of dubious value. The DLSE's Opinion Letter addresses the definition of "employee" for the purposes of wage orders of the Industrial Wage Commission. (DLSE Opinion Letter, at p. 1.) Because this case does not involve a wage order and neither the trial court nor the Club has shown

---

[7] The trial court ruled that California Code of Regulations, title 27, section 25102, subdivision (h) did not incorporate other provisions of the Labor Code or Unemployment Insurance Code that related to the listed sections, like Labor Code section 3352. The Club nonetheless relies on this statute, which we interpret as a repudiation of this ruling. We also struggle to see how it would make sense to consult Labor Code section 3351 in isolation from related statutes that create exclusions from its definition. The question is ultimately academic here, however, because the exception for volunteers who receive no remuneration at all was recognized in *Hollywood Canteen* even in the absence of a statute like Labor Code section 3352, subdivision (a)(9).

14

that the wage orders use the same or a similar definition of "employee" as Labor Code section 3351, the DLSE Opinion Letter provides little guidance in this case. The two-page letter is also devoid of legal analysis and authority to support its conclusion that the intent of the parties is dispositive when determining whether a person is an employee or volunteer. We therefore place little weight on this letter. (Cf. *Oliver v. Konica Minolta Business Solutions U.S.A., Inc.* (2020) 51 Cal.App.5th 1, 27 [DLSE Opinion Letter interpreting Labor Code section not helpful due in part to the lack of legal analysis supporting its conclusion].)

Decisions construing Labor Code section 3351 nonetheless instruct that the motivations of an individual are relevant when determining whether he or she is a volunteer or employee, as is the issue of whether the individual received any compensation. *Hollywood Canteen* concluded a plaintiff who danced with soldiers was not an employee of the dance hall where she was injured while dancing because she intended to offer her services gratuitously as a contribution of the entertainment industry to entertain servicemen. (*Hollywood Canteen*, *supra*, 27 Cal.2d at pp. 805–806, 807.) The court also noted that the plaintiff was not paid. (*Id.* at pp. 805–806.) *Barragan*, following *Hollywood Canteen* and applying the statutory exemption currently found at Labor Code section 3352, subdivision (a)(9), similarly considered both that the plaintiff extern did not intend to provide gratuitous services to the hospital and that the extern did in fact receive valuable remuneration in the form of instruction and on-the-job training. (*Barragan*, *supra*, 195 Cal.App.3d at p. 650.) The reasoning in both cases indicates that an individual's subjective motivations are important, but so is the interrelated question of whether the individual actually received compensation in exchange for his or her service. We also heed the observation in *Brassinga v.*

15

*City of Mountain View*, *supra*, 66 Cal.App.4th at page 214, that "it is the reality of the relationship rather than the characterization of it by the parties that controls."

The question of compensation is particularly significant here, because Labor Code section 3351, subdivision (c) specifically provides that the category of "employees" includes "[a]ll officers and members of boards of directors of quasi-public or private corporations while rendering actual service for the corporations for pay." If the Club's officers received compensation, then, by statute they would qualify as employees, regardless of their subjective intent. We conclude, based on the undisputed facts, that the officers did receive compensation in the form of dues waivers. (*Barragan*, *supra*, 195 Cal.App.3d at p. 642 [where facts are undisputed, the question of whether an individual is an employee is one of law].)[8]

"[T]here is a long line of case law establishing the rule that one need not receive actual payment of money or wages in order to be an employee for purposes of the Workers' Compensation Act." (*Barragan*, *supra*, 195 Cal.App.3d at p. 650; see *Arriaga*, *supra*, 9 Cal.4th at p. 1065 [credit against court-imposed fine was renumeration]; *Hollywood Canteen*, *supra*, 27 Cal.2d at p. 806 ["pecuniary consideration is not required," italics omitted]; *Morales v. Workers' Comp. Appeals Bd.* (1986) 186 Cal.App.3d 283, 289 [inmate who participated in a work release program received renumeration in the form of release from confinement]; *Anaheim General Hospital v. Workmen's Comp. Appeals Bd.* (1970) 3 Cal.App.3d 468, 473

---

[8] Although Mateel does not rely on Unemployment Insurance Code section 621, we note that subdivision (a) of that statute supports our approach here, as it provides that "[a]ny officer of a corporation" is an employee, without regard to payment or compensation. (Unemployment Ins. Code, § 621, subd. (a).)

16

[money paid by hospital to nursing student's school in exchange for student's services was compensation because school did not have to charge student tuition]; *Gabel v. Industrial Accident Commission* (1926) 83 Cal.App. 122, 123, 125–126 [exchange of labor between neighboring farmers was renumeration].)  The waivers of membership dues that the Club formerly provided to its officers were something of value exchanged for the officers' service, so the waivers constitute compensation.

The Club's bylaws in effect when the Club had nine officers confirm this conclusion, since they stated that the dues waivers were provided to officers "in recompense for the hours donated in conducting official business of the Club."  The bylaws further stated that no officers other than the Membership Secretary and the Treasurer would receive "monetary remuneration."[9]  The phrasing "*monetary* remuneration" distinguishes between monetary and other forms of remuneration.  This provision is therefore consistent with the waivers being compensatory for all officers because the waivers were in the form of free membership in the Club and not paid in cash.  Moreover, the bylaws also reveal the officers' intent, as they indicate that the Club's officers knew before taking office that they would receive the benefit and performed their service in exchange.

To escape the conclusion that the dues waivers provided to the officers were compensation, the Club argues that the dues waivers were merely a reimbursement of the expenses of membership that were incidental to service as an officer.  The Club contends Labor Code section 3352, subdivision (a)(9) permits such reimbursements without jeopardizing an individual's status as a volunteer.  We reject this post hoc characterization of the dues waivers,

---

[9] There is no indication in the record that the Membership Secretary or Treasurer ever received monetary remuneration.

however, because it fails to account for the Club's contemporaneous bylaws showing that the dues waivers were compensatory.

Our conclusion that the Club's officers received compensation for their service and therefore qualify as employees under Labor Code section 3351, subdivision (a)(9) is significant because the Club had nine officers who served throughout the first part of the statute of limitations period, between February 20 and October 30, 2017. As a result, summary judgment for the Club is inappropriate if there is a triable issue as to whether the Club had at least one other employee on any date during this period on which leaded ammunition was discharged into the land at the Club's property. (Cal. Code Regs., tit. 27, § 25102, subd. (h) [10-employee test applies "on the date on which the discharge . . . occurs"].)

Based on the record before us concerning the Club's Junior Trap program, during which leaded ammunition was discharged, we find there is.[10] The Club defends the trial court's finding that members were not promised and did not expect to receive dues waivers in exchange for their service by citing certain members' declarations to that effect. But other evidence in the record supports contrary inferences about the motivations of the members who operated the Junior Trap program. The members whose declarations the Club submitted admitted they knew in advance that they might receive

---

[10] Mateel offers various additional theories for other forms of compensation Club members received for their service besides dues waivers, such as an increased benefit and utility from Club improvements, increase in the value of Club memberships that might inure to members' benefit if the Club were ever to dissolve, and avoidance of an additional $50 in dues the bylaws obligated a member to pay if he or she did not provide volunteer service. Mateel did not adequately raise most if not all of these theories in its briefing below, and they are unnecessary to discuss in light of the conclusion we reach about the members who ran the Junior Trap program, so we express no opinion about these contentions.

18

dues waivers before performing their service, calling their motivation into question.[11]  Moreover, two of the members who declared that they did not expect a dues waiver for their work on the Junior Trap program in 2017–2018 had received a waiver of dues in the prior year.  From their prior receipt of a waiver and continued service, one could reasonably infer that the members continued to serve in expectation of receiving another waiver.  It is immaterial that the dues waivers were never guaranteed or that members received a dues waiver in the year after their service.  In *Laeng*, the plaintiff was injured when trying out for a job as a sanitation worker.  (*Laeng*, *supra*, 6 Cal.3d at p. 774.)  The plaintiff's compensation there was contingent, as there was no guarantee the plaintiff would be hired, yet the California Supreme Court nonetheless found he was an employee.  (*Id*. at pp. 774, 776–777.)  Similarly here, the possibility that the Club would not grant a dues waiver does not conclusively establish that the Club's members who operated the Junior Trap program were volunteers.  It is also common for employees to be paid after they perform services, so the timing of the dues waivers is not remarkable.

In addition to finding the due waivers were not compensation, the trial court cited the absence of a formal contract for hire and the fact that at least some members continued to serve after the Club discontinued the practice of offering dues waivers.  The former is irrelevant because the California

_____

[11] The Club contends Mateel waived the argument that members who received dues waivers qualified as employees by failing to identify the specific members in its briefing in the trial court.  This argument is meritless.  Mateel's separate statement cited to the Club's own evidence to support its claim that individuals receiving fee waivers were employees, and the Club chose to identify such individuals by pseudonyms to protect their privacy.  The Club cannot credibly contend it was unable to identify the individuals on whom Mateel's argument turns.

19

Supreme Court has held that a formal contract is not necessary for an individual to be an employee under Labor Code section 3351. (*Laeng*, *supra*, 6 Cal.3d at pp. 776–777; see also *Waggener v. County of Los Angeles*, *supra*, 39 Cal.App.4th at p. 1081 [courts should eschew "a rigid contractual analysis" when evaluating whether someone is an employee].) The latter is insufficient to establish that the members' earlier service was performed without expectation of compensation in the face of the contrary evidence discussed above.

In sum, there is a triable issue of fact as to whether the Club had at least 10 employees during the relevant time period because all nine of the Club's officers between February 20 and October 30, 2017, received compensation in the form of dues waivers and were therefore employees under Labor Code section 3351, subdivision (a)(9), and there is a triable issue of fact concerning whether at least one of the Club's members who received a dues waiver for performing service for the Club's Junior Trap program was an employee under Labor Code section 3351. Accordingly, the court erred in granting summary judgment to the Club on the basis that it was not a "person in the course of doing business" subject to Proposition 65's discharge prohibitions. (§ 25249.11, subd. (b).)

## DISPOSITION

The judgment is reversed. The case is remanded to the trial court for proceedings consistent with this opinion. Mateel is entitled to its costs on appeal.

BROWN, J.

20

WE CONCUR:

POLLAK, P. J.
STREETER, J.


*Mateel Environmental Justice Foundation v. Ukiah Rifle and Pistol Club* (A159015)